(277 P.3d 1170)
No. 105,595

NORMAN PISHNY, GERALD U. MATILE and LYNNE L. MATILE, Husband and Wife, and THOMAS S. WATSON, TRUSTEE OF THE THOMAS S. WATSON TRUST U.T.A. 05/02/01, *Appellants*, v. THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF JOHNSON COUNTY, KANSAS, ANNABETH SURBAUGH, CHAIRMAN, and ED EILERT, JOHN PATRICK SEGALE, DOUGLAS E. WOOD, C. EDWARD PETERSON, JOHN TOPLIKAR, and DAVID A. LINDSTROM, COMMISSIONERS, and THE CITY OF OVERLAND PARK, KANSAS, *Appellees*.

548

Opinion filed May 4, 2012.

*James R. Orr*, of Westwood, and *Richard Eckert*, of Topeka, for appellants.

*Neil R. Shortlidge*, of Stinson Morrison Hecker LLP, of Kansas City, Missouri, *Michael R. Santos*, city attorney, of Overland Park, and *Michael M. Shultz*, of Kaup & Shultz, LC, of Lawrence, for appellee City of Overland Park, Kansas.

*Donald D. Jarrett* and *Richard J. Lind*, of Johnson County Legal Department, for appellee Board of County Commissioners.

Before HILL, P.J., GREEN, J., and LARSON, S.J.

HILL, J.: One of the many duties of a county commissioner in Kansas is to decide whether a city's proposed annexation land into the city provides for the orderly growth and development of the entire community, both inside and outside the city. In this appeal, a coalition of landowners seeks the reversal of the resolution by the Board of County Commissioners of Johnson County granting an annexation petition of the City of Overland Park. Our review of the record reveals that the Board of Commissioners did not lose jurisdiction to make this decision, as the landowners contend. The Board left the record open and accepted evidence after the public hearing on the matter was held and thus did not adjourn their meeting sine die. Also, the statutory requirement for making such a decision within 7 days of the public hearing is directory and not mandatory; therefore, the commission did not lose jurisdiction to decide this matter for that reason. Next, we hold that substantial evidence supports the Board's decision. Further, the record also reveals that those opposed to the annexation received their due process rights of receiving notice and being heard in a meaningful way despite their claims to the contrary. Finally, we hold that both the City and the Board of Commissioners substantially complied with the annexation statutes.

*Overland Park wanted to expand.*

In 2007, the City of Overland Park began taking steps to annex about 15 square miles of land in Johnson County. So, in August of that year, the City approved a petition for annexation that requested the Johnson County Board of Commissioners to first conduct a public hearing on the advisability of the annexation and then grant the annexation. Throughout this opinion we will refer to the Commissioners as "the Board" and Overland Park as "the City."

A group of landowners opposing annexation formed and called themselves the "No to Annexation Coalition." Their officers are Norman Pishny, Lynne and Gerald Matile, and Thomas S. Watson. These officers were the named plaintiffs in the challenge to the annexation filed in the district court. We will refer to them as the "No Coalition."

Citing K.S.A. 12-521 as authority, the City filed its petition on August 23, 2007. The petition was supported by a report on the City's plans for extending municipal services to the area. This report included:

- a physical description of the area proposed to be annexed;
- a breakdown of the existing land uses, platting, zoning, and land use planning;
- discussion about the existing streets, sewer districts, fire districts, school districts, and utilities;
- an estimate of the current population;
- the rationale for the proposed annexation;
- an explanation as to how municipal services would be extended to the annexed area;
- a list of services not provided by the City;
- a timetable for the extension of municipal services to the annexed area and the method of financing;
- a cost analysis regarding the financial impact on residents of the City and residents of the annexed area.

One portion of the report specifically dealt with fire services. It noted that the area proposed to be annexed was located entirely within the boundaries of Johnson County Fire District #2. If the annexation was approved, the City intended to provide fire and

emergency services to the annexed area through an intergovernmental service agreement with the Fire District. The report suggested the City would negotiate a 3-year agreement in which the City would compensate the Fire District $180,000 per year for providing services to the annexed area.

After some discussion, the Board decided to hold a public hearing on the proposal on October 30, 2007. The Board notified the public of this hearing by publishing in the local newspapers a copy of a sketch marking the land the City wanted to annex, the legal description of the land, and a list of the landowners who were affected by the proposal.

This same information, along with a copy of the petition for annexation, the City's service extension plan, and various other documents were also posted on the County's website. Later, in September, landowners in the area proposed for annexation were notified of the public hearing via certified mail and given copies of pertinent documents as well. These landowners were identified by Kansas Title Company.

Sometime prior to September 24, 2007, it was discovered that Kansas Title had failed to identify the owners of an 11.33 percent interest in a certain tract included in the area proposed to be annexed. These landowners were Frank L. Mackey and Virginia A. Mackey. Notice of the public hearing and the materials described above were then sent to the Mackeys by way of certified mail on September 24, 2007. Virginia Mackey acknowledged receipt of the mail on September 25, 2007.

Once notices were sent out, various other governing bodies began to act upon the City's proposal. On September 10, 2007, the City agreed to pass certain "grandfathering ordinances" if the County approved the petition for annexation. Then, on September 24, 2007, the City Planning Commission issued a resolution finding the proposed annexation plan was compatible with the City's plans. The following day, Johnson County deemed the annexation plan compatible with its long range plans as well.

The Fire District met on October 19, 2007, to consider the agreement with the City. Information presented at that meeting indicated the City had indeed offered the Fire District a contract

for \$185,000 per year for 3 years of services to the area proposed for annexation. However, the Fire District approved a proposed agreement that increased the contract term to 10 years and required the City to pay the Fire District \$508,000 per year for the first 5 years and \$315,000 per year thereafter. At a City council meeting held on October 24, 2007, the City voted to approve the Fire District's proposed agreement.

*The Board's hearing on the petition was left open.*

On October 30, 2007, the Board's public hearing on the annexation petition opened. At the meeting, the City presented testimony and exhibits regarding the proposed annexation. Then, members of the public, including the No Coalition, commented on the proposal. Near the end of the meeting, the Chairman of the Board announced that the record would close on November 30, 2007, and information could be added to the record until that time. The Chairman noted that when the record closed on November 30, the Board would make its decision within 7 days. The meeting was then adjourned.

But the taking of public comment did not end on November 30 because on November 15, 2007, the Board passed a resolution extending the time for submitting information to the record to February 15, 2008, at 5 p.m. The Board indicated that allowing additional time would be beneficial to the citizens and the City, as they would have more time to provide comments and information after the holiday season.

Both the City and the No Coalition took advantage of this opportunity to make additional comments and submissions to the Board. Starting in late January 2008 and throughout the month of February, the City submitted additional information to the record. On January 25, 2008, it submitted a rejoinder to statements made by representatives of the Fire District in response to questions posed by the County. Then, on February 6, 2008, the City filed (1) a rejoinder to the responses provided by the Johnson County Sheriff's Office in response to questions posed by the County; (2) a rejoinder to the responses provided by the City of Spring Hill in response to questions posed by the County; and (3) a response to

comments and inquiries of miscellaneous citizens. The City also submitted further information to the record on February 12, 2008. On February 15, 2008, the City submitted more information to the record, including a document titled, "fire service agreement (Option 6)" and "Substitute for SEP Errata Sheet No. 2."

For their part, the No Coalition and other members of the public also sent emails to the Board, appeared personally and spoke at regular Board meetings, and presented other information on their position. On February 15, 2008, counsel for the coalition also submitted numerous exhibits to the record. The record closed sine die at 5 p.m. that day. After that, on February 19, 2008, the No Coalition counsel wrote the Board, again expressing opposition to the annexation. The bulk of this letter complained about the City's "last-minute" negotiations with the Fire Department. The letter condemns the Option 6 fire agreement and the City's attempt to "cobble together" a plan.

Finally, on February 21, 2008, the Board rendered its decision on the matter. After setting forth a great deal of analysis, Johnson County approved the annexation in part and denied it in part. After dividing the proposed annexation areas into five separate parts, the Board decided that annexation of areas 1, 2, and 3 was advisable, but annexation of areas 4 and 5 was not. This meant that a little over 8 square miles were annexed by the City.

Landowners from the No Coalition appealed the Board's decision to the district court. That court affirmed the decision, finding the Board's action was supported by substantial evidence, and the Board acted lawfully and within the scope of its authority.

To us, the No Coalition raises five issues in their challenge to the district court's approval of the annexation:

- the annexation is void because the Board lacked jurisdiction to enter its final order;
- there was insufficient evidence upon which to grant the annexation;
- the landowners' due process rights were violated because of continuous changes to the City's plan;
- the landowners' due process rights were violated due to ex parte communications related to the annexation; and,

• the Board and the City did not comply with the annexation statutes.

*We review the law of annexation and our standard of review of such questions.*

The City sought approval of the annexation from the Board by following the procedures set out in K.S.A. 12-521 *et seq.* According to that law, a city must first seek the approval of the board of county commissioners for such annexation. The statute goes on to establish many procedural requirements that the city and county must follow during the annexation process. These procedures include notice to all affected, including other units of government as well as land-owners, and a public hearing, where the board of county commissioners is acting in a quasi-judicial capacity. Ultimately, the board must consider the impact of approving or disapproving the annexation and make written findings of fact and conclusions concerning whether annexation would cause manifest injury to the landowners, nearby landowners, and the city. K.S.A. 12-521(c). In fact, K.S.A. 12-521(c) lists 14 specific factors the board must consider when making its decision.

When reviewing a county's decision about such a proposal, this court must determine whether, as a matter of law, the board of commissioners (1) acted fraudulently, arbitrarily, or capriciously; (2) issued an order supported by substantial evidence; and (3) acted within the scope of its authority. *Baggett v. Board of Douglas County Comm'rs*, 46 Kan. App. 2d 580, Syl. ¶ 2, 266 P.3d 549 (2011). However, this court cannot substitute its judgment for that of the board members who act as the elected representatives and were able to observe and hear testimony. The determination whether a board acted arbitrarily or capriciously depends entirely on whether the board's conclusion with regard to manifest injury was based upon substantial evidence.

The Board issued its decision on February 21, 2008. Because this decision was made before the 2009 amendments to K.S.A. 77-621 became effective on July 1, 2009, we must employ the standard of review set forth at K.S.A. 77-621(c)(7). See *Baggett*, 46 Kan. App. 2d at 585. This means we review the Board's determination

for evidence "that is substantial when viewed in light of the record as a whole." K.S.A. 77-621(c)(7). Substantial evidence to support a quasi-judicial finding is defined as evidence that possesses both relevance and substance and furnishes a substantial basis of fact from which the issues can reasonably be resolved. *Baggett*, 46 Kan. App. 2d at 585.

Finally, the test we apply to municipal actions is one of substantial compliance with the annexation statutes. Substantial compliance means compliance with respect to the essential matters necessary to assure every reasonable objective of the annexation statutes. *City of Lenexa v. City of Olathe*, 233 Kan. 159, 164, 660 P.2d 1368 (1983). On appeal, it is not the function of this court to reweigh the evidence. This court must only concern itself with the evidence which supports the findings below and not evidence which might have supported contrary conclusions. *Baggett*, 46 Kan. App. 2d at 585.

*The Board did not lose jurisdiction to make this annexation decision because it left the record open.*

The No Coalition argues this annexation order by the Board is void because it did not act in a timely fashion. The group argues the Board adjourned the October 30, 2007, public hearing "sine die"—so it had only 7 days from that date to render a decision. But the Board did not render a decision until February 21, 2008—clearly more than 7 days after the October 30 hearing. Two reasons compel us to reject this argument. First, we are not convinced the Board adjourned sine die on October 30 because the Board left the record open, allowing further public comment and it considered additional information submitted during this extension of time. Second, even if the No Coalition *had* shown the October 30 meeting was adjourned sine die, they have not demonstrated as a matter of law that the failure to issue a judgment within 7 days renders their decision void for lack of jurisdiction. We consider a question of jurisdiction to be a matter of law over which we exercise plenary review. *Max Rieke & Bros., Inc. v. Van Deurzen & Assocs.*, 34 Kan. App. 2d 340, 343, 118 P.3d 704 (2005).

The focus of this argument is on language used in the annexation statute itself. K.S.A. 12-521(d) states the "board of county commissioners shall render a judgment [on a proposal for annexation] within seven days after the [public] hearing has been *adjourned sine die.*" (Emphasis added.) No Kansas case has addressed what it means to adjourn a public meeting on an annexation proposal "sine die."

The record discloses that near the end of the public hearing, someone asked when the Board would meet to consider the annexation issue. The Chairman of the Board responded that it could be done at a regular or special meeting. When asked whether a meeting had been scheduled, the Chairman explained that the Board had not scheduled anything and stated:

"What we know from this point is: we'll take this input; we've currently scheduled the record to close on the 30th; depending on what occurs between now and the 30th, we may open and extend that time.So I can't tell you what date. If the record stays as is, it will close on the 30th, we will be then making a decision within seven days. If that's a normal Board meeting, that would be the meeting of the sixth of December. If there's a special Board meeting set, then we would have to publish that, and we'll give you that notice."

The Chairman then declared the meeting "Adjourned."

Indeed, Black's Law Dictionary 47 (9th ed. 2009) defines "adjourn sine die" as ending "a deliberative assembly's or court's session without setting a time to reconvene." And here, there has been no claim (nor is there any evidence) that the Board set a time to reconvene after the October 30, 2007, public hearing. We note that this term is often used with the closing of the legislature's sessions and means it will no longer deliberate until the body is reconvened by operation of law. In other words, the body has finished its work until the law compels it to meet again. For purposes of this annexation statute, we take that term to mean that time when the board will no longer take evidence on the annexation matter. That definition does not fit with the facts here.

To the contrary, it seems the Board made a conditional adjournment. A conditional adjournment is a term defined in the same annotation as the definition of adjournment sine die in Black's Law Dictionary 47 (9th ed. 2009). It is "[a]n adjournment that does not

schedule another meeting, but provides for reconvening the assembly at an officer's or board's call or *under other defined circumstances.*" (Emphasis added.)

Those circumstances calling for the Board to reconvene were made clear by the Board here. Even though the Board did not set a date to reconvene on the annexation matter, the Board stated that the annexation proceeding would remain open for further submission of information to the record. In fact, it was explained in three separate instances at the meeting that the record would close on November 30, and the Board would make its decision within 7 days of *that* date. The Chairman did not use the phrase "sine die" when adjourning the October 30 meeting, but only stated the meeting was adjourned.

When the district court looked at this issue, it concluded the Board did not adjourn the public hearing sine die on October 30, 2007, but expressly held the record open for further submission to the record. We agree with the district court.

The Board leaving the record open could not have been a surprise to the No Coalition. At both the start and end of the October 30 hearing, the Chairman explained that the record would remain open until November 30, 2007, at 5 p.m., and that correspondence, comments, and information could be submitted to the record until then. No person at the public meeting objected to this procedure. And the No Coalition does not claim that an objection was made either at or after the meeting.

To the contrary, the No Coalition took advantage of the procedure suggested by the County. Orr, who represented the No Coalition, submitted to the record on February 15, 2008, a 46-page document which included proposed findings, conclusions, authorities, and other documents. Several members of the No Coalition thanked the Board for allowing additional time to submit information to the record after the public hearing. Also, they appeared at subsequent Board meetings and presented information on the No Coalition's position. Two of the No Coalition members sent a letter to property owners of the annexed area urging them to engage in a letter-writing campaign to the Board prior to the close of the record on November 30.

In addition, the No Coalition's first amended notice of appeal stated, "The Board adjourned the matter *sine die on February 15, 2008 at 5:00 p.m.*" (Emphasis added.) It was not until the Plaintiff's second amended petition that the No Coalition changed their position and began to allege the meeting was simply adjourned. Although not in the annexation context, our Supreme Court has said that parties on appeal may not complain of matters to which it consented or take advantage of error that it invited or in which it participated. *Hawkinson v. Bennett*, 265 Kan. 564, 590, 962 P.2d 445 (1998).

In a similar vein, the No Coalition has not shown the Board failed to substantially comply with any essential matter in this proceeding, as the No Coalition clearly benefitted from the opportunity to submit additional information to the record and participate in Board meetings. See *City of Lenexa*, 233 Kan. at 163-64. Clearly, one of the objectives of the annexation statute is for the public to have the opportunity to express to the Board their views on the annexation proposal. The No Coalition certainly had ample opportunity here to submit their views.

The No Coalition's argument that the Board was required to continue the hearing for good cause under K.S.A. 12-521(b) is also unpersuasive. K.S.A. 12-521(b) provides that the public hearing shall be fixed on a date that falls 60-70 days after the petition for annexation was presented. The remainder of the subsection describes the notice requirements as they pertain to the public hearing. The last sentence states that the board may, for good cause shown, "continue the hearing beyond the time specified in the notice without further publication." K.S.A. 12-521(b).

We do not believe that provision of the statute applies here. The Board did not continue the hearing. Instead, the Board simply allowed the record to remain open for a period of time and set no date for further public meetings. Second, the statutory provisions relate mostly to notice. The sentence, which is placed in the section regarding notice requirements, gives the Board authority to continue the public hearing without further notice to the public (via publication). This brings us to our third observation.

The statute does *not* state, as the No Coalition claims, that in order to continue the public meeting, a motion must be made, the Board must take a vote, and the Board must show proof of good cause. In fact, the annexation statutes contain no specific procedure for granting continuances. When statutes are plain and unambiguous, this court will not read a statute to add something not readily found in the statute. *Matjasich v. Kansas Dept. of Human Resources*, 271 Kan. 246, 252, 21 P.3d 985 (2001).

On this note, the No Coalition asks this court to take judicial notice of Exhibit 107, the Rules of Order of Johnson County. The No Coalition argues these rules confirm that Board action, such as the grant of a continuance, required a motion, a second, and a statement by the Chairman. However, the No Coalition does not mention the district court's ruling that certain exhibits proposed by the No Coalition, including Exhibit 107, were "outside the permissible scope of review by the Court." Because the No Coalition has not appealed this evidentiary ruling, the No Coalition cannot rely on the exhibit on appeal. See *Board of Lincoln County Comm'rs v. Nielander*, 275 Kan. 257, 268, 62 P.3d 247 (2003).

The No Coalition also argues that keeping the record open is not the same as holding a public hearing, and if allowing people to send letters or make presentations equates to having a public hearing, then all statutes requiring public hearings are meaningless. But the No Coalition fails to acknowledge that the Board *did* hold a public hearing as required by statute. The No Coalition cites no authority indicating it was entitled to something more.

The No Coalition also notes the Board *later* passed a resolution to continue the public hearing process—suggesting the Board knew it had made a mistake by not formally continuing the hearing. The group is apparently speaking of the Board's November 15 resolution extending the time for submitting information to the record to February 15, 2008. The No Coalition argument on this point is unpersuasive for two reasons. First, the coalition offers mere speculation about the Board's intentions—as their allegation is not supported with any citation to the record. Second, the Board's explanation for its actions is a more likely characterization of what occurred. As the Board points out, the November 15 resolution to

extend the time for keeping the record open was necessary in order to give public notice of the extension; unlike the November 30 deadline that was announced at the October 30 public hearing, there was no public proceeding at which the extension of time could be announced. In summary, the No Coalition has not shown the October 30 meeting was adjourned sine die.

We turn now to the question that if the Board had adjourned sine die, would that mean it had no jurisdiction to render an annexation decision more than 7 days later? In our view, because the 7-day statute is directory and not mandatory, the Board did not lose jurisdiction to decide this matter.

To support their jurisdictional argument, the No Coalition relies upon *In re Petition of City of Shawnee for Annexation of Land*, 236 Kan. 1, 13, 687 P.2d 603 (1984) in contending: Jurisdiction is conferred upon a county by the express provisions of K.S.A. 12-521, and a board has no jurisdiction to act upon a petition for annexation unless it substantially complies with the language and purpose of the statute. This is only a general statement regarding the principles of law applicable to annexation proceedings.

*City of Shawnee* did not address the specific issue raised here—whether a board loses jurisdiction to issue a decision on an annexation proposal if it does not render a decision within 7 days of adjourning a public hearing sine die. The only jurisdictional issues raised in *City of Shawnee* were (1) whether the appellate court could consider an appeal where the notice of appeal was allegedly untimely; and (2) whether a board had authority to reconsider and modify its prior denial of an annexation petition. 236 Kan. at 9, 12. *City of Shawnee* does not control here.

To the contrary, we find other cases more persuasive. In *Expert Environmental Control, Inc. v. Walker*, 13 Kan. App. 2d 56, 56-57, 761 P.2d 320 (1988), the Kansas Department of Health and Environment failed to issue an order within 30 days of an administrative hearing as required by statute, but issued its order after 154 days. On appeal, the party against whom the order was sought argued the order was void for lack of jurisdiction. 13 Kan. App. 2d at 57.

This court disagreed, holding the 30-day statutory time limit was not mandatory, and the agency's failure to render a timely order did not deprive the agency of jurisdiction. The court explained:

" 'In determining whether a legislative provision is mandatory or directory, it is a general rule that where strict compliance with the provision is essential to the preservation of the rights of parties affected and to the validity of the proceeding, the provision is mandatory, but where the provision fixes a mode of proceeding and a time within which an official act is to be done, and is intended to secure order, system and dispatch of the public business, the provision is directory.' *Paul v. City of Manhattan*, 212 Kan. 381, Syl. ¶ 1, 511 P.2d 244 (1973)." 13 Kan. App. 2d at 58.

The *Walker* court noted that in *Paul*, the Supreme Court identified two factors that aid in determining whether a statute is mandatory:

" 'Factors which would indicate that a statute or ordinance is mandatory are: (1) the presence of negative words requiring that an act shall be done in no other manner or at no other time than that designated, or (2) a provision for a penalty or other consequence of noncompliance.' 212 Kan. 381, Syl. ¶ 2." 13 Kan. App. 2d at 58.

After examining those factors, the *Walker* court concluded that agency delay did not deprive KDHE of jurisdiction or render its order void, noting the 30-day time limit was only a procedural requirement that was directory in nature and intended to secure order, system, and the dispatch of public business. 13 Kan. App. 2d at 58.

Likewise, the 7-day time limit of K.S.A. 12-521(d) is a procedural requirement that is directory in nature. K.S.A. 12-521(d) contains no negative words requiring that a judgment could not be rendered at any other time and contains no penalty or consequence of noncompliance. The requirement appears only to fix a mode of proceeding with the annexation process in order to secure the timely dispatch of public business.

Because the 7-day requirement is directory, not mandatory, the Board's failure to issue a judgment on the annexation petition within 7 days of the public meeting would not have rendered the Board's judgment void for lack of jurisdiction—even if the meeting had been adjourned sine die.

For their final jurisdiction contention, the No Coalition argues the Board's decision exceeded its own jurisdiction because it required the City to enter an unspecified, future agreement with Aubry Township. The No Coalition argues that because a county loses jurisdiction over an order once it makes its final decision, there was no way for the County to enforce a future agreement with Aubry Township—so the decision was ultra vires and void.

Even so, when examined in light of all of the annexation statutes, any annexation authorized under K.S.A. 12-521 is conditional. After all, the legislature has obliged the Board, through the requirements of K.S.A. 12-531, to review a city's compliance with its service extension plan 5 years after approval of the annexation. In cases of noncompliance with the plan, the Board could order the land "de-annexed." With such authority granted by the legislature, the fact that the Board here required the City to later reach an agreement with Aubry Township is hardly ultra vires.

The No Coalition's argument on this point is not supported with legal analysis or citation to authority. Our Supreme Court has ruled that when a litigant fails to press a point by supporting it with pertinent authority, he waives or abandons the issue. *McCain Foods USA, Inc. v. Central Processors, Inc.*, 275 Kan. 1, 15, 61 P.3d 68 (2002). Thus, we deem the No Coalition has abandoned this argument.

We hold the Board did have jurisdiction to render a decision in this case.

*The evidence supports the Board's decision.*

At this point, we turn to the coalition's claims that the evidence did not apply to the area actually annexed, the Board considered the wrong plan, and the district court applied an incorrect standard of review. Our standard of review of such questions is straightforward. This court must review the Board's determination for evidence "that is substantial when viewed in light of the record as a whole." K.S.A. 77-621(c)(7). Moreover, it is not the function of this court to reweigh the evidence. This court must only concern itself with the evidence which supports the findings below and not evidence which might have supported contrary conclusions. *Baggett,*

46 Kan. App. 2d at 585. Finally, when the district court has made findings of fact and conclusions of law, this court determines whether those findings are supported by substantial competent evidence and are sufficient to support the conclusions of law. *Banzer v. City of Wichita*, 237 Kan. 798, 802, 703 P.2d 812 (1985).

*Wrong area*

The No Coalition complains that "crucial" facts that were submitted pertained to the *entire* area proposed for annexation (*i.e.*, 14.95 square mile area), but those facts were not relevant to the smaller area that was actually annexed. For example, they say the City never provided cost data and tax revenue data for the areas actually annexed, and the only data provided on this point pertained to the entire area proposed for annexation. The group argues that under K.S.A. 12-521(a)(2) and (c)(7) and (8), the cost of annexation must be disclosed. We hold a different view. The City substantially complied with the law, and it was not required to submit new information limited to each of the five areas created by the Board in its approval. In other words, information pertaining to the entire area is sufficient.

It is important to examine the Board's decision before going further. The Board stated that in determining whether all or part of the proposed annexation should be approved, it considered the proposed annexation area "both as a whole and in identifiable parts." The Board identified five separate areas within the proposed annexation area that had common characteristics and could readily be considered as individual areas—Area 1, Area 2, Area 3, Area 4, and Area 5. The Board then made 14 general findings (labeled a through n) that pertained to "the area as a whole." These findings were labeled in a manner nearly identical to the 14 criteria set forth in K.S.A. 12-521(c).

Notably, K.S.A. 12-521(c) states that upon holding the public hearing, the board shall make written findings of fact and conclusions determining whether the proposed annexation "or the annexation of a lesser amount of such area" causes manifest injury to the owners of the land proposed to be annexed or manifest injury

to the owners of nearby land or the city if annexation is disapproved. The statute provides:

"In determining whether manifest injury would result from the annexation, the board's considerations shall include, but not be limited to, the extent to which the following criteria may affect the city, the area to be annexed, the residents of the city and the area to be annexed, other governmental units providing services to the area to be annexed, the utilities providing services to the area to be annexed, and any other public or private person, firm or corporation which may be affected thereby:

"(1) Extent to which any of the area is land devoted to agricultural use;

"(2) area of platted land relative to unplatted land;

"(3) topography, natural boundaries, storm and sanitary sewers, drainage basins, transportation links or any other physical characteristics which may be an indication of the existence or absence of common interest of the city and the area proposed to be annexed;

"(4) extent and age of residential development in the area to be annexed and adjacent land within the city's boundaries;

"(5) present population in the area to be annexed and the projected population growth during the next five years in the area proposed to be annexed;

"(6) the extent of business, commercial and industrial development in the area;

"(7) the present cost, methods and adequacy of governmental services and regulatory controls in the area;

"(8) the proposed cost, extent and the necessity of governmental services to be provided by the city proposing annexation and the plan and schedule to extend such services;

"(9) tax impact upon property in the city and the area;

"(10) extent to which the residents of the area are directly or indirectly dependent upon the city for governmental services and for social, economic, employment, cultural and recreational opportunities and resources;

"(11) effect of the proposed annexation on the city and other adjacent areas, including, but not limited to, other cities, sewer and water districts, improvement districts, townships or industrial districts and, subject to the provisions of K.S.A. 12-521a, fire districts;

"(12) existing petitions for incorporation of the area as a new city or for the creation of a special district;

"(13) likelihood of significant growth in the area and in adjacent areas during the next five years; and

"(14) effect of annexation upon the utilities providing services to the area and the ability of those utilities to provide those services shown in the detailed plan."

Here, the Board set forth a separate section for each of these criteria and discussed the evidence presented on each point. This evidence pertained to the area proposed for annexation as a

whole—not to the five separate areas identified by the Board. Some sections of the ruling amounted to a few sentences, while other sections extended to more than a page of discussion.

Then, the Board set forth its findings with regard to the factors in K.S.A. 12-521a, which deals with fire protection. Notably, K.S.A. 12-521a states:

"When determining the effect of a proposed annexation on a fire district or a portion of a fire district, considerations by the board of county commissioners shall include, but not be limited to, the:

"(a) Response time of the city and the fire district to the area proposed to be annexed;

. "(b) impact on the fire district from the decrease in its tax base if the annexation is approved;

"(c) impact on the city's provision of fire service if the annexation is disapproved;

"(d) impact on the residents of the area if the annexation is approved; and

"(e) impact on the remainder of the fire district if the annexation is approved."

The Board set forth a separate section, highlighting the relevant evidence with regard to each of these five factors. This evidence also pertained to the area proposed for annexation as a whole.

Finally, the Board made specific findings with regard to each of the five separate areas it identified. For Area 1, the Board made 9 findings. For Area 2, the Board made 8 findings. For Area 3, the Board made 9 findings. For Area 4, the Board made 7 findings. For Area 5, the Board made 8 findings.

We view these findings as a result of the Board sitting in a quasi-judicial fashion. For example, in the Board's examination of areas 4 and 5, the Board noted both areas had mostly larger tracts of land. Some tracts were 80 or 160 acres. Both areas required 10 acres minimum for a home site, in contrast with areas 1, 2, and 3 which could be characterized as mostly urban fringe properties. In areas 4 and 5, sewer service was not expected for a minimum of 3 years and up to 17 years for other parts of the two areas, in marked contrast with the other three areas that all had sewer service of some type. Furthermore, the City of Spring Hill considered part of area 5 to be in its growth area. Also, that area included some of the Spring Hill school district and the Spring Hill recreation district. All of these appear to be excellent reasons for denying the

annexation petition for those two areas. That reasoning does not mean the Board's findings covered the wrong area as the coalition contends.

It is true that the Board did not discuss each of the 14 factors set forth in K.S.A. 12-521(c) and each of the 5 factors set forth in K.S.A. 12-521a with regard to each of the five areas. However, for each area the Board discussed *some* of the factors. For example, with regard to Area 1, the Board mentioned the unincorporated portion of the area, how the area bordered with the city, how the area was subdivided and platted, the present population, how the land was zoned, and the Fire District's agreement to provide services to the area, the availability of sewer facilities, and the nature of the area.

When the district court dealt with this subject of substantial evidence, the court concluded that the record, "which consist[ed] of 10 volumes of over 3,000 pages of written reports, hearing minutes and other documentation," demonstrated the Board substantially considered the K.S.A. 12-521(c) criteria when approving the annexation in part. With regard to Areas 1 through 5, the court stated: "The Board acted reasonably and in compliance with the statute in considering the proposed annexation area as 5 areas and made adequate findings related to each area. The findings of the Board as to each area were supported by substantial evidence in the record." Nothing in the record on appeal leads us to disagree with the district court's conclusion on this point.

The flaw with the No Coalition's argument on this point is that it is unsupported by the annexation statutes or Kansas case law. K.S.A. 12-521(c) approves annexation of the area proposed for annexation "or the annexation of a lesser amount of such area." K.S.A. 12-521(d) states that if a majority of the Board concludes that annexation "or any part thereof" should be allowed, the Board shall grant the annexation by order. The annexation statutes clearly contemplate a situation such as this one, where the Board grants an annexation in part. No provision of the statutes state the City must provide an amended plan or amended information in the event that a partial annexation is being considered by the Board, or if it is actually granted.

Further, no provision of the annexation statutes indicates that if an annexation is granted in part, the Board must have separate information pertaining only to the area it decides should be annexed. And no law requires the City to provide such segregated information in its proposal or plan. Instead, in discussing the City's required plan for the extension of services, Kansas law refers to the extension of services to the area "proposed to be annexed." K.S.A. 12-520a(a)(3). And, when stating the City must prepare a report setting forth its plan for extension of services—and the requirement that the report contain the estimated cost of providing services—Kansas statues refer to the area "proposed to be annexed." K.S.A. 12-520b(a)(1) and (2). Clearly, the City is only required by statute to provide information pertaining to the *entire area* proposed for annexation.

If we were to adopt the view of the No Coalition on this point, the City would need to submit multiple annexation plans with various combinations of segregated data in order to cover the many possible combinations the Board could approve. Certainly, the legislature would have stated such a requirement had it intended to make one. See *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 607-08, 214 P.3d 676 (2009).

The No Coalition does not claim the City failed to provide any particular information as it pertains to the area proposed for annexation as a whole, so we must presume this information was properly provided. And the Board's decision reflects that it *did*, in fact, consider some of the statutory factors as they related to the smaller area actually annexed. In light of the extensive amount of information and data before the Board and its thorough analysis of each factor it must analyze when considering an annexation, we conclude, as did the district court, that substantial evidence supports the Board's approval of this annexation of just part of the land.

*Refinements made to the service extension plan offered by the City did not make it the wrong plan as the No Coalition contends.*

The No Coalition next argues the City's plan changed so many times that the Board based its ruling on the wrong plan. The group

says the Board's decision cited information obtained from the City's August 20, 2007, plan—but that plan was amended many times to reflect different information. In the No Coalition's view, this continuous amendment to the plan by the City made meaningless the statute that requires the City to attach a service extension plan to the annexation petition. We are not persuaded by this contention because the No Coalition's view of what constitutes a plan is too narrow.

Under the statutory scheme at play here, the plan the City was required to present to the Board is simply a written proposal that sets out how it intends to extend municipal services to the area to be annexed. K.S.A. 12-521(a)(2) requires the plan to have sufficient detail so that it provides a reasonable person a full and complete understanding of the intentions of the city on how it is going to extend each service to the annexed area. It must also estimate the costs for extending such services.

The No Coalition claims the Board cited outdated evidence with regard to the cost of governmental services—noting the Board referred to the City's original plan for the proposed cost of such services, but corrected cost information was provided in later submittals. But the No Coalition fails to point us to this corrected cost information in the record. Under Supreme Court Rule 6.02(d) (2011 Kan. Ct. R. Annot. 39), any material statement made in an appellant's brief that is not keyed to the record on appeal may be presumed to be without support. See *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 777, 27 P.3d 1 (2001). Because the No Coalition's claim is not supported with citation to the record, the claim fails.

The No Coalition next says the Board's decision differed from updated information in terms of cost and revenue numbers. Specifically, the group claims the Board's decision cites total operating costs of $625,000 for 2008, net operating costs of $446,610 for 2008, and decreased net operating costs of $218,035 for 2009 due to receipt of taxes and other fees. But according to the No Coalition, plan changes that were allegedly distributed at the October 30, 2007, public hearing indicated actual revenues would be $599,050 and net operating costs would be $531,825.

The No Coalition correctly cites the numbers. Although the City's original plan estimated net operating costs of $218,035 for 2009, the City's amended numbers indicated net operating costs of $531,825 for that year. This is obviously a substantial difference.

Nevertheless, this court cannot conclude the Board's decision was not supported by substantial evidence based on this one, albeit large, variance between estimates. It is important that an estimate was given and an updated estimate with more accurate figures is desirable for decision makers and the public as well. K.S.A. 12-521(a)(2) merely requires that the City provide an "estimated cost" of providing services to the annexed area. Under K.S.A. 12-521(c), the Board must make findings of fact and conclusions on the annexation proposal "based upon the preponderance of evidence presented to the board." And as the Board points out on appeal, the City's plan was not the only evidence submitted to the Board.

The Board had several thousand pages of evidence before it, including documents and testimony. In its decision, the Board stated it has considered the "entire record of proceedings," including the petition for annexation and service extension plan, the testimony and comments heard at the October 30 meeting, the responses for requests for information made by the Board, the written comments of residents and members of the public, supplemental information provided by the City and the City of Spring Hill, and information provided by the No Coalition attorney Orr. As we have noted, it is not the function of this court to reweigh the evidence; we are concerned only with the evidence which supports the findings made below and not the evidence which might have supported contrary conclusions.

We find no merit in the group's final argument on this point— that the City's failure to provide a plan that includes evidence relevant only to a partial annexation renders the statutory, 5-year annexation review requirement impossible. See K.S.A. 12-531(a).

The City set forth a timetable for extending municipal services in its August 20, 2007, plan. The table indicates the City and County would immediately provide street, bridge, and storm drainage maintenance, for example, to the annexed area. At the time of any mandated statutory review, the Board could hear testimony, as

permitted under K.S.A. 12-531(b), on whether the City has followed through with providing services such as these.

*The effect of the district court's comment is exaggerated by the No Coalition.*

Next, the No Coalition contends the district court applied the wrong standard when it ruled the City's evidence must not be relevant to the annexation actually granted. The context of this statement is important here. In response to the No Coalition's arguments about the evidence pertaining to the wrong area, the district court stated:

"No Coalition asserts that the defendants failed to substantially comply with the annexation statutes because the proposed services plan was not germane to the area approved for annexation. However, K.S.A. 12-521 allows the board to approve a portion of the proposed annexation and does not require an amended proposed services plan be presented to the board. The plan must simply provide estimates of anticipated costs, and need not be amended to provide the board with better estimates once additional information has been obtained.

"As the Court ruled in its March 31 Journal Entry, the defendants substantially complied with the annexation statutes. The plan provided the statutorily required information and *must not be germane to the area approved for annexation.*" (Emphasis added.)

Focusing on the italicized words, the No Coalition argues to us that the district court's statement means that *any* annexation plan, such as an annexation plan for the City of Salina, for example, could have been used to support the annexation in this case.

This argument greatly exaggerates the district court's ruling and is unpersuasive. When read in context, it is clear that the district court's statement responded only to the No Coalition's argument that the Board must have segregated evidence regarding the area actually annexed. The district court did not suggest that data derived from any property located in the state of Kansas could be used to support the proposed annexation in this case, but merely indicated that the data pertaining to the proposed annexation could support the grant of a partial annexation.

*We find no procedural due process errors.*

The No Coalition next contends the annexation is void because their members' due process rights were violated in two ways: (1) the City made numerous modifications to its original plan, but the County held no public hearings at which landowners could address the City's new information; and (2) the County, the City, and the Fire District engaged in ex parte communications regarding the annexation. The question of what process is due in a given case is a question of law over which an appellate court has unlimited review. *State v. Wilkinson*, 269 Kan. 603, 608-09, 9 P.3d 1 (2000). Our review of the record compels us to hold there was no deprivation of due process here.

When dealing with questions such as these, the court must first determine whether a protected liberty or property interest is involved, and if so, the nature and extent of the process due. *Winston v. Kansas Dept. of SRS*, 274 Kan. 396, 409, 49 P.3d 1274 (2002). Here, the No Coalition is correct that they had some due process rights in the annexation proceeding. In *In re Petition of City of Overland Park for Annexation of Land*, 241 Kan. 365, 370-71, 736 P.2d 923 (1987), our Supreme Court explained that the full rights of due process present in a court of law do not automatically attach to a quasi-judicial proceeding such as an annexation proceeding. Nevertheless, a fair reading of that opinion leads to the conclusion that the basic elements of procedural due process of law—notice and an opportunity to be heard at a meaningful time and in a meaningful manner—do apply in annexation proceedings. Thus, we must decide whether the No Coalition was given adequate notice and an opportunity to be heard at a meaningful time and in a meaningful manner throughout the annexation proceedings.

We turn first to the questions raised by the many additions and corrections made to the plan before the annexation was granted in part. We find the group had adequate notice and an opportunity to be heard.

The No Coalition does not claim the group had no notice of the October 30, 2007, public hearing or the information distributed prior to that meeting. Instead, the group complains about the in-

formation distributed *at* the hearing and later. Further, the group does not claim it had no notice that the City submitted new information or that it was unable to access it, but only that the information "dramatically altered" and "re-wrote" the City's original plan. From this, the No Coalition concluded they were entitled to another public hearing at which it could address the new information.

The problem with this argument is that the group fails to provide any legal authority that requires a public hearing every time an annexation record is supplemented with additional information. Instead, the annexation statutes contemplate only a single public hearing. The statutes refer to *"the* public hearing." (Emphasis added.) See K.S.A. 12-521(b). Simply put, the No Coalition has not shown it was entitled to more than one public hearing. Moreover, there is no evidence it was *denied* public hearings, as it claims in its brief. The group points to no instance in which it requested a public hearing and that request was denied.

Further, there is no Kansas statute that prohibits the Board from allowing the City and members of the public to submit information to the record after the public hearing. The Board's ultimate decision should be "based upon the preponderance of evidence presented to the board." K.S.A. 12-521(c). The annexation statutes do not state when or where this other evidence must be obtained and do not indicate that the City's original information cannot be supplemented, corrected, and updated. Particularly where the No Coalition had access to all submissions of information via the County's website, the No Coalition cannot show their due process rights were violated.

Clearly, the No Coalition cannot claim they had no opportunity to respond to any information submitted to the record. The record demonstrates quite the opposite. Even if, as the No Coalition says, the City presented changes that consisted of "hundreds of pages of information" at the October 30, 2007, public hearing, it does not explain why it had "no opportunity to read and consider" the new information. Orr, Pishny, and the Matiles all spoke at the meeting. The record remained open for 3½ months following this meeting, giving the No Coalition plenty of time to access and re-

spond to any of the information presented at the meeting. In fact, the No Coalition *did* respond.

After the October 30 meeting, the No Coalition and other members of the public wrote emails to the Board, appeared at regular Board meetings, and presented information on their position. And on February 15, 2008, the final day for submitting material to the record, Orr submitted a 46-page document on behalf of the No Coalition that included proposed findings, conclusions, authorities, and other documents. The No Coalition cannot legitimately argue they did not have ample opportunity to be heard on this annexation.

In its brief, the No Coalition specifically complains about the City's submissions to the Board made on February 12, 2008, and February 15, 2008. First, the No Coalition says the City's February 12, 2008, submission contained modifications that were made "far too late" for them to have notice or an opportunity to be heard on the information. The No Coalition says these changed the original plan "beyond recognition," into a totally different creature.

The No Coalition says the City's February 12 submission "explicitly changed" the plan, and that platting and population trends changed but the No Coalition fails to identify the exact changes. From the brief, this court could assume the City's population estimate simply changed from 105,000 to 105,001. The No Coalition tends to use many colorful phrases when describing the alleged changes, such as "morphed beyond recognition," "totally different," and "massive amounts," but does not really articulate what actually changed and how the changes affected the outcome. This court therefore cannot conclude that the February 12, 2008, submission contained changes that deprived the No Coalition of the opportunity to fairly respond.

The other problem is that the No Coalition, through its attorney Orr, *did* respond to the City's February 12 and 15 submissions. The group argues the Board ignored this submission but the record does not clearly disclose that. That is a conclusion of the group that is based upon an inference.

After the record closed on February 15, 2008, Orr wrote the Board a letter dated February 19, 2008, commenting on the City's

"last-minute submission of a new proposal for fire protection, and with the hope that the public can comment on any information the City submits . . . ." The letter addressed many of the group's concerns about the fire protection issue. The No Coalition cannot legitimately argue it had no opportunity to address the City's final submissions to the record. The group contends the Board ignored this last letter but do not show us any proof of that allegation.

Second, the No Coalition says the City's February 15, 2008, submission to the record "radically altered" the City's original plan. But the group fails to articulate what actually changed as a result of the submission. For example, the No Coalition says the City's "last-minute submittals changed the cost of the annexation by at least $3,928,000," but fail to cite the record for support. The No Coalition also says the City materially changed the net tax impact on residents, but does not identify the amount of change or cite the record for evidence. The No Coalition claims the City's final two submissions were so late they could not be scanned and posted to the County's website "in time to impart notice" to the No Coalition, but again fail to support this claim with evidence from the record. In reality, the record contains no evidence regarding the exact time the February 15, 2008, submission was made, nor does it contain evidence regarding what time any documents were posted on the County website—or what was actually posted. And significantly, the No Coalition neglects to mention it *also* (via Orr) submitted a 46-page document to the record on February 15, 2008.

In addition, we note the Board found that the property tax levy would actually decrease because the fire protection levy assessed by the City was considerably smaller than the levy imposed by the Fire District. Along the same line, the contract between the City and the fire district was proposed at the October meeting and finalized before the public comment period expired. This meant the Board had real figures to deal with and not just an estimated proposal. When making decisions, it is better for a board that is acting in a quasi-judicial matter to deal with accurate figures than gross estimates.

In response to these claims, the Board says the No Coalition "greatly misrepresents" the information submitted on February 12

and 15. The Board claims most of the documents submitted at that time were copies of documents that had previously been submitted or minutes of meetings and resolutions. The No Coalition does not challenge this contention in its reply brief.

The problem with the No Coalition's argument remains. This controversy when it was considered by the Board was not a civil suit where parties are entitled by law to complete discovery of information. It was, rather, a governmental board seeking information, weighing that information and making a decision about the advisability of proceeding with annexation. Even if the City supplemented the record in a manner that significantly changed the information they initially provided in its report and plan, the No Coalition has not demonstrated this is contrary to law or that it was unfair under the facts of this case. It was up to the Board to sort through all the information submitted to the record, then consider and weigh this evidence, and render a decision that would "insure the orderly growth and development of the community." See K.S.A. 12-521(c). As long as the No Coalition had access to this information and it was able to respond to the information—and here, it did—it cannot demonstrate it had no opportunity to be heard. Even if the City's data was in a constant state of flux, the No Coalition has not shown that the Board did not adequately assess the information before it and come to a reasonable decision.

The No Coalition has not demonstrated it was not given notice and an opportunity to be heard at a meaningful time and in a meaningful manner on the information submitted by the City.

*Allegations of secret meetings and brokering of deals with the fire district are unsupported.*

The No Coalition next argues their rights to due process were violated by "secret meetings" held regarding the fire services contract. The group claims Johnson County gave the City "private instructions" about its wishes and concerns regarding the fire services contract, and therefore "brokered" the contract between the City and Fire District.

Proof of the Board's involvement in these alleged ex parte communications is imperative if the No Coalition is to persuade us on

this point. The Dictionary of Modern Legal Usage describes "ex parte" proceedings as those involving only one party, p. 340 (Garner, 2nd ed. 1995). Because the City and Fire District are not parties to this proceeding, the No Coalition must show the Board was involved in the communications.

There is some evidence that suggests Johnson County officials were communicating with the City and Fire District about some concerns. For example, at a Board meeting, a Board member spoke about "the direction" the County had given with regard to the negotiations between the City and Fire District. The No Coalition cites numerous instances in which the City's attorney referred to concerns and wishes expressed by the County—which the No Coalition says suggests the County was "dealing behind the scenes" with the City and Fire District. On appeal, the Board actually acknowledges a meeting among the attorneys for the City, Johnson County, and Fire District in which it says the County's attorney asked for "clarification" with regard to the fire services agreement.

Despite this, the No Coalition has not shown how these alleged communications between the County and City deprived it of notice or the opportunity to be heard. In the end, the fire services agreement was negotiated between the City and Fire District—two governmental entities—and was included in the record, which made it available for inspection by members of the public *and* the Board. And after the "Option 6" contract was added to the record, the No Coalition (via Orr) wrote the Board in response to the City's "last-minute" negotiations with the Fire Department. The No Coalition was able to address its concerns about the agreement.

Going further, the No Coalition fails to acknowledge that the wishes and concerns apparently expressed by the Board to the City actually benefitted the County *and* the No Coalition's positions. For example, the County complained that the compensation the City offered to pay the County was inadequate and the agreement did not address a partial annexation. On appeal, the No Coalition does not say how, as a result of these alleged ex parte communications, the fire services agreement harmed it. The No Coalition says the ex parte communications "profoundly changed" the annexation plan "to the tune of millions of dollars" but fails to support

this statement with facts from the record. The No Coalition has not demonstrated its due process rights were violated as a result of alleged ex parte communications.

For its second claim, the No Coalition says the County's procedure for communicating with it was "inconsistent and chaotic at best, and in fact facilitated or even legitimated off-the-record exchanges of information." This claim is also unpersuasive.

Initially, we point out that the No Coalition has not shown any individual was unable to communicate with or contact the Board or unable to contribute information to the record as a result of the "chaotic" procedure followed by the Board. At the October 30, 2007, public hearing, the Chairman of the Board explained that if anyone wished to have correspondence included in the official record, he or she must submit the information no later than November 30 to the Board of County Commissioners, to the Clerk's attention. The Chairman also explained that people could add information to the record, contact Commissioners, or participate in the public comment portion of Board meetings. Many members of the public, including the No Coalition, successfully added information to the record, contacted Board members, and spoke at Board meetings. The No Coalition cannot show their due process rights were violated as a result of the procedure.

For its final claim in this area, the No Coalition alleges there were a number of substantive ex parte communications between particular Commissioners and members of the public regarding the annexation.

First, a careful reading of the email exchanges cited by the No Coalition reveal they were not substantive. In one email, Commissioner John Segale thanked the resident for his thoughts and stated he believed his property taxes would decline as a result of the annexation. The email is two sentences long. In another email, Segale again thanked the resident for his thoughts and directed him to the County website. This email is also two sentences long. The only email of considerable length composed by Segale discussed his view of long-term development and community concerns *in general*. No information contained in the alleged ex parte communications between Segale and private citizens is meaningful.

Second, the record reveals that plaintiff Tom Watson engaged in these alleged ex parte communications himself. As the County points out on appeal, Kansas courts are not receptive to complaints about ex parte communications from those who have also participated in such communications. See *City of Overland Park*, 241 Kan. at 372.

To summarize, the No Coalition has not shown their rights to due process were violated as a result of ex parte communications concerning the fire services agreement, an inconsistent procedure for communicating with the County, or email communications between Commissioners and persons from the community. We do not see how the No Coalition was deprived of any due process rights. The No Coalition had more than ample opportunity to participate and be heard throughout this annexation proceeding.

*We summarily deal with several alleged statutory violations.*

Using an unpersuasive scattergun approach, the No Coalition claims 25 separate statutory violations by the City and the Board. Upon closer review of each, it becomes apparent that many of the claims essentially raise arguments that we have already analyzed and rejected. In addition, many of the allegations are duplicates. To help organize the issues for purposes of analysis, we have numbered the allegations 1 through 25.

At this point, it is important to restate our standard of review on these claims. When reviewing an annexation decision, the function of the court is to determine whether the city had statutory authority to act and acted in accordance with that authority. *City of Lenexa*, 233 Kan. at 163-64. The test of municipality action is one of "substantial compliance"—which means compliance with respect to the essential matters necessary to assure every reasonable objective of the annexation statutes. 233 Kan. at 164.

In allegations 1, 2, 3, 4, 11, 14, and 24, the No Coalition makes the same argument. The group contends the annexation did not comply with the law because the City's initial plan changed many times—an argument we have previously addressed and rejected.

In allegations 5 and 6, the No Coalition says the City's plan must provide the estimated cost of the annexation—and this information

was not provided. To the contrary, the City's plan did include tables for estimated ongoing operating costs for 3 years, estimated revenues, estimated one-time costs, and costs of capital projects. The plan also had a section titled "Cost Impact on Residents of Area Proposed to be Annexed." And this section set forth particular costs for residents, such as the cost of cable television services and storm water utility fees. Although the City's plan may not have discussed all costs and revenues in the detail desired by the No Coalition and may not have reflected changes in the excise tax (as noted by the No Coalition), the City's information substantially complied with the pertinent statute.

In allegation 7, the No Coalition says the plan must state a method for financing the extension of services, but here the City's plan did not include items such as the "belated extra millions to the Fire District" and the effect of a partial annexation. In this apples and oranges argument, the No Coalition compares dissimilar items. The *method* of financing is not the same as the *amount* of financing. The plan correctly indicated the method of financing fire protection services.

In allegations 8 and 10, the No Coalition claims the required timetable for extension of services fails with regard to fire services. It is unclear what the No Coalition is complaining about here. The City's plan states that the timetable for extension of fire protection services is immediate. The City's later negotiations and contract with the Fire District did not change the City's intent to immediately provide fire services in the event of annexation.

In allegation 9, the No Coalition complains that the City's plan does not sufficiently address how fire protection services will be maintained. The plan does, in fact, discuss maintenance. Although the plan may not have discussed maintenance in the sort of detail desired by the No Coalition, there was substantial compliance with the statute.

In allegation 12, the No Coalition says the City failed to give proper notice to the Mackeys. As we noted in our recitation of the facts, notice of the public hearing and the required materials were sent to the Mackeys via certified mail on September 24, 2007. Virginia Mackey signed, acknowledging receipt of this mailing, on

September 25, 2007, over 1 month prior to the public hearing. The statutory notice requirement was substantially complied with. Frankly, we doubt that the No Coalition has standing to complain about a claimed lack of service on another individual.

Allegations 13 and 22 relate to the No Coalition's jurisdictional argument, which was previously rejected. Allegation 15 relates to the No Coalition's due process arguments, which were rejected above. Allegations 16, 17, 18, and 25 pertain to the No Coalition's arguments that the Board based its decision on the wrong plan, the wrong evidence, and the wrong area—which we have already rejected.

In allegation 19, the No Coalition complains about the statutory requirement that the County consider the tax impact upon the property annexed and the City's property. For support, the No Coalition sets forth a long list of somewhat disconnected arguments that have either been rejected above or are unsupported with record citations. Suffice it to say the City's plan included two tax sections titled, "Net Tax Impact on Residents in the Area Proposed to be Annexed" and "Effect of Proposed Annexation" on Aubry Township, the Fire District, and the County.

In allegation 20, the No Coalition complains that the City's plan was "woefully lacking" with regard to information about the Fire District. But in fact, the City's plan included four full pages of discussion about fire protection services and indicated the City planned to negotiate and enter an intergovernmental service agreement with the Fire District. The No Coalition does not really say what information is lacking except to complain about the dollar figures related to a partial annexation.

In allegation 21, the No Coalition alleges the County must consider petitions for incorporation, yet a petition that was presented was never the subject of any public hearing. The Board's decision, however, discusses the petition for incorporation. Other than saying there was no public hearing or "joint discussion" on the matter, the No Coalition has not shown the Board did not consider the petition.

In allegation 22, the No Coalition renews the previous argument that the County cannot place future conditions upon an annexa-

tion—an argument rejected above as unsupported with legal authority.

The No Coalition has not demonstrated that the City and Board failed to substantially comply with the annexation statutes. Instead, the voluminous record in this case reflects the City provided a substantial amount of detailed, thoughtful research on the proposed annexation, and the Board properly considered all the information before it.

## Conclusion

After examining the record, we can find no fault with what the Board did. This massive decision, with far reaching implications, was made by two elected governing bodies, first the City and then the Board. We will not substitute our judgment for the Board's. The Board substantially complied with all legal procedures. At the end of the day, this was a decision for the elected Board of County Commissioners of Johnson County, Kansas, to make. We will neither alter it nor set it aside.

Affirmed.